IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SCIENTIFIC GAMES
INTERNATIONAL, INC.,

    Plaintiff,

     v.

OBERTHUR GAMING
TECHNOLOGIES,

    Defendant.

CIVIL ACTION FILE

NO. 1:02-CV-3224-TWT

OPINION AND ORDER

This is a patent infringement action.  It is before the Court on the Plaintiff's

Motion for Claims Construction [Doc. 87].

I. BACKGROUND

Plaintiff Scientific Games International, Inc. and Defendant Oberthur Gaming

Technologies are competitors in the lottery products and services industry.  The

Defendant is the owner of the two patents in suit: U.S. Patent No. 5,704,647 ("the

'647 patent") and U.S. Patent No. 5,803,504 ("the '504 patent").  The application

resulting in the '647 patent was filed in February 1996.  The application for the '504

patent, which is a continuation-in-part of the '647 patent, was filed in February 1997.

The patents claim a method of producing lottery tickets and the lottery tickets

produced by the method.  Both patents are titled "Multicolor Overprinting of Scratch-Off Lottery Tickets" and list Jean-Pierre Desbiens as the inventor.[1]  The method for producing lottery tickets covered by these patents utilizes a multicolor process printing technique to print color images on top of a latex scratch-off layer.  This process is used to create a more aesthetically pleasing lottery ticket, and can provide additional security to combat counterfeiting by increasing the relative difficulty of reconstructing the graphics by persons attempting to access the words and symbols beneath the scratch-off layer.

The Plaintiff filed this action seeking a declaratory judgment that the patents in suit are invalid and unenforceable, alleging that the patent claims are either anticipated or obvious in light of the prior art.  The Plaintiff also contends that the Defendant knew of the invalidating prior art before seeking patent protection, but failed to disclose the prior art to the patent office.  The Defendant filed a counterclaim, alleging infringement of the patents in suit.  The merits of the parties' claims cannot be addressed until the court determines the proper scope and meaning of the patent claims.  Thus, claims construction is the first step of the analysis.  C.R. Bard, Inc. v. United States Surgical Corp., 388 F.3d 858, 861 (Fed. Cir. 2004).

---

[1]The '504 patent also lists Stephen John Holman as an inventor.

The claims at issue in the two patents are essentially the same.  One of the relevant claims, which is representative of the numerous claims at issue, is claim 1 of the '647 patent, which reads as follows:

1.  A method of producing a *lottery ticket* comprising:

(a)   applying printed indicia on a substrate;

(b)   *covering at least a portion of the printed indicia with a scratch-off layer*; and

(c)   *applying an overprinting layer over the scratch-off layer*, said *overprinting layer* comprising an *image obtained from a design* in which at least two colors in the design have been separated into screened half tone images of each color and then said images are *superimposed in separate printing steps* to form said *overprinting layer*.

('647 patent, claim 1) (emphases added).  The parties move the Court to construe the italicized disputed terms and phrases.[2]

## II.  CLAIMS CONSTRUCTION STANDARD

The construction of claims in a patent is a matter left to the province of the Court.  Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).  In construing patent claims, the Court looks first to the intrinsic evidence.  The intrinsic evidence

---

[2]The parties agreed on the construction of the following terms and phrases: "printed indicia," "substrate," "scratch-off layer," "separated into screened half tone images of each color," and "wherein the colors are yellow, green, cyan, magenta, orange and black."  (Joint Claim Construction Statement, at 1-2.)

consists of the patent itself, the claim terms, the specification (or written description), and the patent prosecution history, if in evidence. Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1346 (Fed. Cir. 2004). However, not all intrinsic evidence is equal. Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998). First among intrinsic evidence is the claim language. Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999). A "bedrock principle" of patent law is that the claims of the patent define the patentee's invention. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Thus, the Court's focus must "begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1370 (Fed. Cir. 2005) (quoting Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001)); see also Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."). When reading claim language, terms are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art at the time of the invention. Phillips, 415 F.3d at 1313-14; see also Texas Digital Sys., Inc. v. Telegenix, Inc., 308

F.3d 1193, 1202 (Fed. Cir. 2002) ("The terms used in the claims bear a "heavy presumption" that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art.").

Thus, an objective baseline from which to begin a claim construction is to determine how a person of ordinary skill in the relevant art would understand the term. Phillips, 415 F. 3d at 1313. Although "the claims of the patent, not its specifications, measure the invention," Smith v. Snow, 294 U.S. 1, 11 (1935), the person of ordinary skill in the art is deemed to read the claim term in the context of the entire patent, including the specification, rather than simply in the context of the particular claim in which the disputed term appears. Phillips, 415 F.3d at 1313. For instance, the patentee may act as his own lexicographer and set forth a special definition for a claim term. However, in order for that special definition to control, it must be clearly stated in the specification or during the patent prosecution. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996); Markman, 52 F.3d at 980; see also Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001) (patentee may act as own lexicographer by "clearly setting forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning"); Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc., 214 F.3d 1302, 1307 (Fed. Cir. 2000) ("Absent an express intent to impart a novel meaning, claim terms take on their

ordinary meaning."). Similarly, the patentee may limit the scope of a claim by using words or "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325 (Fed. Cir. 2002).

Claims are part of a "fully integrated written instrument" and, therefore, "must be read in view of the specification, of which they are a part." Phillips, 415 F.3d at 1315. In fact, the specification is "the single best guide to the meaning of a disputed term" and is often dispositive. Id. (quoting Vitronics Corp., 90 F.3d at 1582). Nevertheless, the Court must be careful not to read a limitation into a claim from the specification. Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 904 (Fed. Cir. 2004). In particular, the Court cannot limit the invention to the specific examples or preferred embodiments found in the specification. Phillips, 415 F.3d at 1323; see also Resonate Inc. v. Alteon Websystems, Inc., 338 F.3d 1360, 1364-65 (Fed. Cir. 2003) ("[A] particular embodiment appearing in the written description may not be read into a claim when the claim is broader than the embodiment."). In addition to the specification, the prosecution history may be used to determine if the patentee limited the scope of the claims during the patent prosecution. Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995). The prosecution history helps to demonstrate how the patentee and the Patent and Trademark Office ("PTO")

understood the patent.  Phillips, 415 F.3d at 1317.  However, because the prosecution history represents the ongoing negotiations between the PTO and the patentee, rather than a final product, it is not as useful as the specification for claim construction purposes.  Id.

Extrinsic evidence, such as expert and inventor testimony, dictionaries, and learned treatises, is only considered when the claim language remains genuinely ambiguous after considering all of the patent's intrinsic evidence.  Tegal Corp., 257 F.3d at 1342.  Although less reliable than the patent and prosecution history in determining construction of claim terms, extrinsic evidence may be used to help the Court understand the technology or educate itself about the invention.  Phillips, 415 F.3d at 1317; Vitronics Corp., 90 F.3d at 1584.  In particular, because technical dictionaries collect accepted meanings for terms in various scientific and technical fields, they can be useful in claim construction by providing the Court with a better understanding of the underlying technology and the way in which one skilled in the art might use the claim terms.  Phillips, 415 F.3d at 1318.  But, extrinsic evidence, including dictionary definitions, cannot be used to vary or contradict the terms of the patent claims.  Tegal Corp., 257 F.3d at 1342; see also Vitronics Corp., 90 F.3d at 1584 n.6 (courts are free to consult dictionaries "so long as the dictionary definition

does not contradict any definition found in or ascertained by a reading of the patent documents"), quoted in Phillips, 415 F.3d at 1322-23.

## III.  DISCUSSION

The parties disagree about the construction of seven claim terms and phrases present in claims 1 and 4 of the '647 patent and in claims 1, 4, 5, 7, 8, and 10 of the '504 patent: (1) "lottery ticket"; (2) "covering at least a portion of the printed indicia with a scratch-off layer"; (3) "overprinting layer"; (4) "applying an overprinting layer over the scratch-off layer"; (5) "applying an overprinting layer over at least the scratch-off layer"; (6) "image obtained from a design"; and (7) "superimposed in separate printing steps."[3]  Each of the disputed claim terms is discussed separately below.

### A.  "lottery ticket"

The Plaintiff proposes that "lottery ticket" means "a card or playing piece distributed or sold as part of a scheme for the distribution of prizes by lot or chance." The Defendant contends that the term means "a substrate that contains secure variable printed indicia printed on a game area for use in a game sponsored by a government sanctioned authority, whereby one or more prizes are distributed by chance among

---

[3]The claim terms at issue in the two patents are identical with the exception of disputed terms (5) and (6): the only difference between these terms is the addition of the modifier in (6) that the overprinting layer cover "at least" the scratch-off layer.

persons who have paid for a chance to win such prize."  The parties appear to agree that a lottery ticket is a type of substrate or game piece that is used as part of a scheme to distribute prizes by chance.  Although the two proposed constructions are similar, the Defendant's construction includes the following additional elements: (1) *secure* printed indicia; (2) *variable* printed indicia; (3) government sponsorship; and (4) payment of consideration.

"Lottery ticket" is not defined in the specification.  However, the specification indicates that "scratch-off type lottery tickets," to which the invention is primarily directed, comprise "a substrate having at least one area overprinted with an elastomer such as an opaque latex ink . . . [that] forms a protective coating that can be scratched off to reveal printed indicia indicating whether or not a prize has been won."  ('647 patent, col. 1, ll. 1-3, 13-18; '504 patent, col. 1, ll. 11-13, 19-24.)  The description of a scratch-off lottery ticket includes the presence of printed indicia.  But nothing in this definition requires that the printed indicia be secure or variable in order to qualify as a lottery ticket.  Nor is there any indication that lottery tickets are limited to those game pieces that are purchased and sponsored by a government sanctioned authority.

The ordinary meaning of "lottery ticket," as informed by the dictionary definition of "lottery," also fails to support the Defendant's proposed construction. See Phillips, 415 F.3d at 1322 ("Dictionaries or comparable sources are often useful

to assist in understanding the commonly understood meaning of words . . . .").
Webster's Dictionary defines "lottery" as "a contest in which tokens are distributed
or sold, the winning token or tokens being secretly predetermined or ultimately
selected in a chance drawing."  <u>Webster's II: New College Dictionary</u> 647 (1995)
("<u>Webster's College Dictionary</u>").  Similarly, the Encyclopedia Britannica describes
"lottery" as a "procedure for distributing something (usually money or prizes) among
a group of people by lot or chance."  7 <u>The New Encyclopaedia Britannica</u> 487 (15th
ed. 1994).  The ordinary meaning of lottery seems only to require that the token or
ticket be used in connection with distributing prizes to a winner by chance.  The
ordinary meaning of lottery does not include a requirement that the chance to win
prizes be linked to government sponsorship.  Furthermore, the ordinary meaning of
lottery does not include a requirement that the chance to win, as represented by the
token or ticket, be purchased.  Rather, the definition of lottery indicates that the lottery
chances may be simply distributed as well as sold.  Nonetheless, the Defendant argues
that the Georgia gambling statute, O.C.G.A. § 16-12-20,[4] supports its inclusion of the

---

[4]O.C.G.A. § 16-12-20 defines "lottery" as "any scheme or procedure whereby
one or more prizes are distributed by chance among persons who have paid or
promised consideration for a chance to win such prize, whether such scheme or
procedure is called a pool, lottery, raffle, gift, gift enterprise, sale, policy game, or by
some other name."  O.C.G.A. § 16-12-20(4).  The statute excludes from the definition
of lottery a "[p]romotional giveaway or contest which conforms with the
qualifications of a lawful promotion specified in paragraph (16) of subsection (b) of

requirement that lottery tickets be purchased.  While it is true that regulations issued by regulatory agencies can be helpful to a claim construction analysis, in order to have any relevance, the regulations must be "probative of an industry-specific meaning for a disputed claim term."  <u>Mars, Inc. v. H.J. Heinz Co.</u>, 377 F.3d 1369, 1374 n.3 (Fed. Cir. 2004) (<u>citing</u> <u>E-Pass Techs., Inc. v. 3Com Corp.</u>, 343 F.3d 1364, 1368 (Fed. Cir. 2003)).  The purpose of the Georgia gambling statute, however, is simply to define what constitutes criminal activity in a single state and is not probative of an industry-specific meaning for a "lottery" or "lottery ticket."

Finally, there is nothing in the ordinary meaning of lottery that requires that the printed contents of the ticket be secure or variable.  One could easily imagine a lottery ticket wherein at least some of the relevant numbers or symbols are visible and/or fixed.  Nevertheless, the Defendant argues that the security of the printed indicia is a necessary component of a lottery ticket.  The patent states that one advantage of the present invention over prior art is that it increases security by using an overprinting technique that provides greater resistance to counterfeiting.  ('647 patent, col. 1, l. 66 to col. 2, l. 18; '504 patent, col. 2, ll. 8-27.)  The specification makes clear that the goal of the invention is to increase security; however, it does not expressly state or imply that in order to qualify as a lottery ticket, the printed indicia must always be

Code Section 10-1-393."  O.C.G.A. § 16-12-20(4)(A).

secure.  See Phillips, 415 F.3d at 1325 (statement indicating that the invention envisioned advantageous projectile-deflecting function of "baffles" did not imply that all structures must serve that function in order to qualify as baffles).  Although it certainly might be preferable or advantageous for the printed indicia to be secure, security is neither inherent in the ordinary meaning of lottery ticket nor is this limitation included in the claim language.  Therefore, the limitation will not be read into the claimed invention.  See Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1301 (Fed. Cir. 2003) ("Advantages described in the body of the specification, if not included in the claims, are not per se limitations to the claimed invention.") (citations omitted); Applied Materials, Inc. v. Advanced Semiconductor Materials Am. Inc., 98 F.3d 1563, 1574 (Fed. Cir. 1996) (purpose of invention "serves as limitation of the claimed invention" only when included in the claims); Dow Chem. Co. v. Astro-Valcour, Inc., 47 F. Supp. 2d 294, 299 (N.D.N.Y. 1999) (improper to read advantage noted in specification into claims as a requirement of inventions).  Accordingly, the ordinary meaning of "lottery ticket," based on the intrinsic evidence and the commonly understood meaning of lottery, does not include the Defendant's proposed additional elements.  Instead, the Plaintiff's proposed construction coincides with the ordinary meaning of the term.  Thus, the Court construes "lottery ticket" to

mean "a card or playing piece distributed or sold as part of a scheme for the distribution of prizes by lot or chance."

"Lottery ticket" also appears in the preamble to claim 1 of the '647 patent and claims 1, 5, and 8 of the '504 patent. The Defendant's assertion that the preamble is limiting is erroneous. A preamble is only limiting if "it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." Intirtool, Ltd. v. Texar Corp., 369 F.3d 1289, 1295 (Fed. Cir. 2004) (quoting Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002)) (internal quotations omitted); see also Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999). But, a preamble is not limiting if the patentee defines a structurally complete invention in the claim body and the preamble only states the purpose or intended use for the invention. Poly-America, L.P. v. GSE Lining Tech., Inc., 383 F.3d 1303, 1309-10 (Fed. Cir. 2004). Here, the claim body describes a complete invention and the preamble simply states the intended use. In addition, the claim body does not derive an antecedent basis from the preamble. The language of the claim does not refer back to or rely upon the preamble for support. Cf. Eaton Corp. v. Rockwell Int'l Corp., 323 F.3d 1332, 1339 (Fed. Cir. 2003) (body of claim referred to "*said* vehicle master clutch" and "*said* drive train," which referred back to

structures previously described in the preamble).  Thus, the preamble is not necessary to give life, meaning, or vitality to the claim and is not limiting.

   B.  "covering at least a portion of the printed indicia with a scratch-off layer"

   The parties have agreed to the construction of "printed indicia" and "scratch-off layer."  Thus, the construction of this disputed phrase centers on the meaning of "covering at least a portion of."  Unless the context suggests otherwise, common words should be interpreted according to their ordinary meaning.  Desper Prods., Inc. v. QSound Labs, Inc., 157 F.3d 1325, 1336 (Fed. Cir. 1998).  "Covering" means "to place something on or over, so as to protect or conceal" or "to overlay or spread with something."  Webster's College Dictionary at 260.  "At least" means "at the lowest estimate: as the minimum."  Webster's Third New Int'l Dictionary 1287 (1976).  "Portion" means "a part of a whole."  Webster's College Dictionary at 861.  Nothing in the intrinsic evidence suggests that the ordinary meaning of these words does not control.  Thus, the ordinary meaning of "covering at least a portion of the printed indicia with a scratch-off layer" is "concealing some or all of the printed indicia by applying a scratch-off layer."

   Although the ordinary meaning of the phrase does not indicate as much, the Defendant argues that the construction should include a requirement that the printed indicia be variable and "securely and completely" concealed by the scratch-off layer.

These limitations are not supported by the language of the claims or the intrinsic evidence.[5]  Nowhere does the specification refer to variability as a requirement, or even a characteristic, of the printed indicia.  Thus, this limitation will not be read into the claim.  Likewise, there is nothing in the intrinsic evidence that requires the printed indicia to be "securely" covered.  As discussed above, absent an express intent to import a limitation, the fact that increased security may be an advantage of the invention does not require that the claim be limited in that manner.  Brookhill-Wilk 1, 334 F.3d at 1301; Applied Materials, Inc., 98 F.3d at 1574.  Finally, the language of the claim itself contradicts the Defendant's assertion that the printed indicia must be completely covered.  Although the printed indicia may be completely covered, the claim language does not require as much.  Rather, the claim states that only a portion of printed indicia is required to be covered with the scratch-off layer.

In support of its construction, the Defendant relies upon a portion of the specification that refers to the printed indicia being "completely" covered.  This is the only reference to complete coverage in the entire patent.  The identified portion of the

---

[5]The Defendant also relies on the specification of an abandoned patent application filed by Desbiens in support of its proposed construction of this term.  However, this patent application, while it relates to the patents at issue, amounts to extrinsic evidence.  See Epic Metals Corp. v. Consolidated Sys., Inc., 19 F. Supp. 2d 1296, 1303 (M.D. Fla. 1998) (continuation-in-part of allegedly infringing patent considered extrinsic evidence).  It will not be considered by the Court unless a genuine ambiguity remains after consideration of the intrinsic evidence.

specification discusses the preferred manner of applying varnish, an optional release coating layer, the scratch-off layer, and the overprint layer that will keep the ticket aligned "to ensure that the printed indicia is completely covered by the scratch-off layer and the overprint layer." ('647 patent, col. 4, ll. 20-30; '504 patent, col. 4, l. 55 - col. 5, l. 3.)  This section begins by stating that "[t]he lottery tickets of the present invention *can be produced by way of example*, in the following manner." ('647 patent, col. 3, ll. 66-67; '504 patent, col. 4, ll. 33-34) (emphasis added).  In addition, it states that the step of the operation concerning covering the game area and printed indicia is "preferably accomplished" by using a particular type of press that is equipped in such a manner that the ticket will remain aligned, allowing the printed indicia to be completely covered.  ('647 patent, col. 4, ll. 20-30; '504 patent, col. 4, l. 55 - col. 5, l. 3.)  This section merely describes a preferred embodiment, which cannot be used to limit a claim.  Phillips, 415 F.3d at 1323; Resonate Inc. v. Alteon Websystems, Inc., 338 F.3d 1360, 1364-65 (Fed. Cir. 2003).  Thus, the Court rejects the Defendant's proposed construction.

C.  "overprinting layer"

The specification does not expressly define the term "overprinting layer." However, the language of the specification suggests that an overprinting layer is a design that is printed over an area that has previously been printed.  This construction

is supported by several dictionaries specific to the field of graphic arts and printing, which define "overprinting" as "printing that is done on top of a previously printed area," The GATF Encyclopedia of Graphic Communications 567 (1998) ("GATF Encyclopedia"), and "double printing; printing over an area that already has been printed," Pocket Pal: A Graphic Arts Production Handbook 199 (16th ed. 1995). Additionally, even the Defendant's expert witness stated that "[o]ne of ordinary skill in the art of security (lottery) printing would understand an overprint layer to be a design printed over the scratch-off layer," and that "[i]n the lottery industry, the term 'overprint' or 'overprint layer' is the design printed on the scratch off layer." (Summary of Expert Opinion of Gordon E. Pickett ¶¶ 59, 69.)  Thus, the meaning of the term "overprinting layer" to a person of ordinary skill in the relevant art is "a design printed on top of a previously printed area."  In the context of the claims at issue, the previously printed area is the scratch-off layer.

However, the Defendant contends that the specification refers to a particular type of overprinting layer.  It argues that the patentee acted as his own lexicographer by expressly limiting the ordinary meaning of overprinting layer in the claim itself. For example, claim 1(c) of the '647 patent states:

> applying an overprinting layer over the scratch-off layer, *said overprinting layer comprising an image obtained from a design in which at least two colors in the design have been separated into screened half*

*tone images of each color and then said images are superimposed in*
*separate printing steps to form said overprinting layer.*

('647 patent, claim 1(c)) (emphasis added).   Similar language appears in the
specification.   (<u>See</u> '647 patent, col. 3, ll. 50-54; '504 patent, col. 3, ll. 32-36.)   The
Defendant argues that the claim and specification language clearly give a special
meaning to overprinting layer.   The Court disagrees.

The Defendant's proposed definition of "overprinting layer" is preceded by the
term "comprising."   Comprising is a term of art used in patent claims that is open-
ended, meaning that the named elements are essential but that other unrecited
elements may be added and still fall within the scope of the claim.   <u>Mars, Inc.</u>, 377
F.3d at 1375-76 (<u>citing</u> <u>Genentech, Inc. v. Chiron Corp.</u>, 112 F.3d 495, 501 (Fed. Cir.
1997)); <u>Manual of Patent Examining Procedure</u> § 2111.03 (8th ed., rev. 1 2003)).   "A
drafter uses the term 'comprising' to mean 'I claim at least what follows and
potentially more.'" <u>CollegeNet, Inc. v. ApplyYourself, Inc.</u>, 418 F.3d 1225, 1235
(Fed. Cir. 2005) (<u>quoting</u> <u>Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.</u>, 212 F.3d
1377, 1383-84 (Fed. Cir. 2000)). Therefore, by using the term comprising in the claim,
the patentee did not clearly and unambiguously limit or redefine "overprinting layer."
<u>See</u> <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996).
Although the cited language still has the practical effect of limiting the scope of the
invention to require a particular type of overprinting layer that includes at least the

recited elements, the language does not redefine the term itself.  Moreover, claim terms are to be construed in relation to the context in which they appear.  <u>Phillips</u>, 415 F.3d at 1315.  The fact that the claim describes the specific elements that must be part of the particular overprinting layer indicates that the patentee did not contemplate that "overprinting layer" inherently includes those limitations.  <u>See id.</u>  Thus, consistent with the ordinary meaning of the term, "overprinting layer" means "a design printed on top of the scratch-off layer."

   D.  <u>"applying an overprinting layer over the scratch-off layer"</u>

   The only term in this disputed phrase that has not been construed previously is "applying."  As a commonly understood word, construction of the term "applying" simply requires application of the widely accepted meaning of the term.  In such circumstances, general dictionaries may be used to ascertain the meaning of the term. <u>Phillips,</u> 415 F.3d at 1322.  "Apply" means "to put on." <u>Webster's College Dictionary</u> at 55.  In the context of the present invention, a person of ordinary skill would understand that putting the overprinting layer on the scratch-off layer would be accomplished by printing the overprinting layer over the scratch-off layer.

   The Court's previous construction of "overprinting layer" and the agreed upon construction of "scratch-off layer" mean that little, if any, additional construction of this disputed term is required.  Nevertheless, the Defendant maintains that further

construction is necessary.  It argues that the phrase should be construed as "printing the overprinting layer over the scratch-off layer, thereby securely covering the variable printed indicia on the game area."   Again, the Defendant proposes a construction that contains elements of security and variable printed indicia.  And again, the intrinsic evidence fails to support the inclusion of these elements.  As noted above, nothing in the specification requires that the printed indicia be variable.  The Defendant argues, however, that the specification and prosecution history require that the printed indicia be "securely covered."  According to the Defendant, this element must be included in the construction because the purpose of the overprinting technique of this invention is to improve lottery ticket security and enhance the overall appearance of the lottery ticket.  ('647 patent, col. 1, ll. 60-65; '504 patent, col. 1, l. 66 - col. 2, l. 1.)  In addition, the Defendant argues that the prosecution history supports the limitation because the patentee distinguished prior art based on the fact that "[t]here is no teaching or suggestion in the reference of the employment of an overprinting layer of the type used in the present invention as a *security improving component* of the lottery ticket."  (Resp. to Office Action, Def.'s Proposed Claim Construction, Ex. 8) (emphasis added).  This is not an express disavowal of claim scope.  Rather, the patentee was distinguishing prior art based on the use of an overprinting layer of screened half tone images.  The fact that this type of overprinting

layer may have the effect of improving security does not translate into a requirement that the overprinting layer must "securely cover" the printed indicia.  It is improper to limit a claim based merely on an articulated objective or purpose of an invention, unless the purpose is clearly expressed in the claim.  Brookhill-Wilk 1, 334 F.3d at 1301; Applied Materials, Inc., 98 F.3d at 1574; see also Liebel-Flarsheim Co., 358 F.3d at 908 ("The fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives.").   The specification and prosecution history do not evidence a clear intention to limit the ordinary meaning of the phrase.  Therefore, because "overprinting layer" and "scratch-off layer" have been construed and "applying" is afforded its common meaning, the Court construes the phrase "applying an overprinting layer over the scratch-off layer" to mean "printing an overprinting layer over the scratch-off layer."

  E. "applying an overprinting layer over at least the scratch-off layer"

  This claim term, which is found exclusively in the '504 patent, is identical to the above-construed phrase, the only difference being the addition of the words "at least."  The parties agree that this addition should be construed in this context to mean "optionally printing the overprinting layer over a portion of the non-scratch-off layer."  (See Pl.'s Resp. in Supp. of Mot. for Claim Construction, at 20.)  Thus, the Court

construes this claim term as follows: "printing an overprinting layer over the scratch-off layer and optionally printing the overprinting layer over a portion of the non-scratch-off layer."

F.  "image obtained from a design"

The parties agree that the two components of this phrase in need of construction are "image" and "design."  Furthermore, the parties seem to agree generally on the proper construction of "image."  The Plaintiff proposes that "image" means "the printed area that recreates the look of" the design.  Similarly, the Defendant contends that the term means "a representation of" a design.  Neither party argues that the specification nor prosecution history limits the meaning of the term.  Thus, the Court construes "image" to mean "a printed representation of" a design.

However, the parties disagree as to the proper construction of "design."  The Defendant contends that "design" means "continuous tone photographs, paintings, drawings, or graphic artwork."  The Plaintiff argues that this construction improperly imports specific types of designs and a continuous tone limitation that are not required by the claim language.  Instead, the Plaintiff proposes that the term be construed broadly to include any type of original graphic.  Generally, as the Plaintiff argues, a court may not add a narrowing modifier to an otherwise general term that is unmodified in the claim.  Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d

1243, 1249-50 (Fed. Cir. 1998); see also Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001) "[U]nless compelled to do otherwise, a court will give a claim term the full range of its ordinary meaning."). However, the Court must read claims in view of the specification. Phillips, 415 F.3d at 1315. For example, if the specification makes clear that a particular feature is not intended to be included in the invention, that feature will be excluded from the scope of the invention, even if the claim language in the abstract might be considered broad enough to include the feature. SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1341 (Fed. Cir. 2001).

Although preferred embodiments cannot be used to import a limitation, statements that describe the invention as a whole may be used to support a limiting definition of a claim term. C.R. Bard, Inc., 388 F.3d at 864; Alloc, Inc. v. International Trade Comm'n, 342 F.3d 1361, 1370 (Fed. Cir. 2003). Here, the specification states that "[i]n accordance with the *present invention* the overprint layer is comprised of the combination of colors so as to produce a *complex image* (e.g., a reproduction of a painting such as the "Mona Lisa") that is extremely difficult to reproduce . . . ." ('647 patent, col. 3, ll. 3-7; '504 patent, col. 3, ll. 27-31) (emphasis added). Accordingly, the specification makes clear that the designs reproduced as the overprint layer are complex and difficult to reproduce.

Furthermore, the specification distinguishes prior art on the basis of printing processes and the resulting simple images and points out the advantages of using the more sophisticated printing process of the present invention to create complex images. See SciMed Life Sys., Inc., 242 F.3d at 1343 (specification distinguished prior art as inferior and cited advantages of coaxial lumen used in catheters that were subject of patent).   The specification identifies prior art overprinting techniques, typically printing processes that consist of the "application of up to four flat colors in various graphic line designs and/or text," that printed simple designs over the scratch-off area. ('647 patent, col. 1, ll. 59-60, 63-65; '504 patent, col. 1, ll. 65-66 -  col. 2, ll. 2-4.) Flat color printing is "a form of color printing in which color dots are not printed on top of each other." GATF Encyclopedia at 313.  The specification characterizes these prior art overprinting techniques as inferior because the processes "create only basic color patterns which are easily duplicated."  ('647 patent, col. 1, ll. 66-67- col. 2, ll. 1-7; '504 patent, col. 2, ll. 8-16.)  In contrast, the Summary of the Invention describes a process in which individual colors are separated into half tone images which are then printed one over the other.[6]  ('647 patent, col. 2, ll. 37-41; '504 patent, col. 2, ll. 46-

---

[6]"Statements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention." C.R. Bard, Inc., 388 F.3d at 864 (citing Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1348 (Fed. Cir. 2004)).

50.)  Accordingly, the specification excludes flat color printing and implicitly limits the invention to a printing technique known as process color printing in which "[half tone] dots of one color are overprinted on dots of one or more other colors to produce blends." Id.; see also id. at 167 ("Process color printing involves overprinting halftone dots . . . .").  The specification expressly states that when the overprint layer is printed using this process color system, "a full-color design, a photograph, a painting or other complex image is reproduced and applied to the lottery ticket."  ('647 patent, col. 4, ll. 55-58; '504 patent, col. 5, ll. 28-31.)  Therefore, read as a whole, the specification suggests that the very character of the invention requires that the design reproduced as the overprinting layer be a full-color design, a photograph, a painting, or other complex image.  See Alloc, Inc., 342 F.3d at 1370 ("[W]here the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims.").  The "continuous tone" limitation, however, does not appear in the specification, and the limitation will not be read into the claim.  Accordingly, the Court construes "image obtained from a design" to mean "a printed  representation of a full-color design or other complex graphic."

    G.  "superimposed in separate printing steps"

The parties' proposed constructions of this disputed phrase are nearly identical. The Plaintiff claims the phrase means "sequentially applying the screened half tone images to create the overprint layer."  The Defendant proposes the following similar construction: "printing the screened half tone images sequentially one over the other so that they can combine and blend optically."  Thus, the parties effectively agree that the ordinary meaning of the phrase is "sequentially printing the screened half tone images."  The Defendant's construction states that the screened half tone images are printed sequentially "one over the other."  This additional language is consistent with common meaning of "superimpose," i.e., "to place on or over something else." Webster's College Dictionary at 1106.  Although this language is not part of the Plaintiff's proposed construction, the Plaintiff does not seem to object to its inclusion in the construction.  (Pl.'s Mem. in Supp. of Mot. for Claim Construction, at 23-24.)

Despite agreeing for the most part on the construction of this phrase, the Plaintiff claims that the Defendant improperly narrows the plain meaning by adding the phrase "so that they can combine and blend optically." As discussed above, this invention uses the process color printing technique to create the overprinting layer. It appears that one skilled in the art would understand that process color is a type of printing "in which dots of one color are overprinted on dots of one or more other colors *to produce blends*." GATF Encyclopedia at 313.  Moreover, this limitation is

drawn directly from the language of the specification.  When discussing the process color printing technique, the specification states: "The separated images are then printed one over the other in transparent ink.  When the separated images are *superimposed*, they *combine and blend optically* to produce the visual effect of full color with virtually limitless tones and shades." ('647 patent, col. 4, ll. 61-65; '504 patent, col. 5, ll. 34-38) (emphasis added).  Therefore, reading the claim term in context, the Court construes "superimposing in separate printing steps" to mean "sequentially printing the screened half tone images one over the other, resulting in the half tone images combining and blending optically."

## IV.  CONCLUSION

For the reasons set forth above, the Motion for Claims Construction [Doc. 87] is resolved as follows: "lottery ticket" means "a card or playing piece distributed or sold as part of a scheme for the distribution of prizes by lot or chance"; the phrase "covering at least a portion of the printed indicia with a scratch-off layer" means "concealing some or all of the printed indicia by applying a scratch-off layer"; "overprinting layer" is interpreted to mean "a design printed on top of the scratch-off layer"; the phrase "applying an overprinting layer over the scratch-off layer" means "printing an overprinting layer over the scratch-off layer"; the phrase "applying an overprinting layer over at least the scratch-off layer" means "printing an overprinting

layer over the scratch-off layer and optionally printing the overprinting layer over a portion of the non-scratch-off layer"; "image obtained from a design" means "a printed representation of a full-color design or other complex graphic"; and "superimposed in separate printing steps" means "sequentially printing the screened half tone images one over the other, resulting in the half tone images combining and blending optically."

SO ORDERED, this 5 day of December, 2005.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge